OPINION
{¶ 1} Defendant-appellant, Dino D. Young, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of murder, with firearm specifications, in violation of R.C. 2903.02, and having a weapon while under disability, in violation of R.C. 2923.13. For the following reasons, we affirm the judgment of the trial court.
 {¶ 2} On June 5, 2003, defendant shot and killed John Hopkins, aka "Face," at 1014 Miller Avenue, Columbus, Ohio. On June 13, 2003, defendant was indicted on one count of murder, with firearm specifications, a violation of R.C. 2903.02 ("Count One"), and one count of having a weapon while under disability, a violation of R.C. 2923.13
("Count Two"). Defendant waived his right to a jury as to count two in the indictment and this count was tried to the court. As to the first count in the indictment, a jury trial was held beginning on June 28, 2004.
 {¶ 3} The evidence presented at trial indicated the following. The shooting death of Mr. Hopkins occurred at a duplex house on Miller Avenue, Columbus, Ohio. The duplex consists of two residential properties, 1014 and 1016 Miller Avenue. Aleshia Dunson, also known as "Dee," lived at 1016 Miller Avenue. Danielle Holloway, also known as "Dinkie," lived at 1014 Miller Avenue with her children.
 {¶ 4} According to Aleshia's testimony, defendant was Danielle's "off and on boyfriend," was the father of Danielle's youngest child, and lived "off and on" with Danielle. (Tr. 134.) On the day of the shooting, Aleshia heard Danielle and defendant arguing. She went into Danielle's home and saw a red beam on the floor by defendant's foot. Aleshia assumed the beam was from a gun. Jumada Williams testified that he saw defendant place a gun, which had a red beam on it, into his waistband. At some point, Aleshia went to her apartment to clean. Jumada went outside to smoke marijuana and drink beer. While Aleshia was cleaning her house, she heard gunshots. She opened the front door to her apartment and saw Mr. Hopkins laying in the doorway to Danielle's apartment, gasping. She saw defendant with a gun in his hand.
 {¶ 5} Linda Paula also testified regarding the circumstances surrounding the June 5, 2003 shooting. Linda, who lived in a duplex house next to Danielle's house, heard defendant, from inside the house, tell Mr. Hopkins to "come in." (Tr. 160.) Linda heard a couple seconds of arguing, and then she heard gunshots. Linda saw Mr. Hopkins laying on the ground, "shaking real bad, like he was going into convulsions." (Tr. 166.) According to Linda, she saw defendant "come out the door, he like kicked him * * * with the gun still in his hand." (Tr. 163-164.) In regard to defendant's actions immediately after the shooting, Linda further testified that "[a]fter just kicking him and just ramping and raving, it was like fuck that motherfucker, fuck him, he shouldn't have came over here, fuck him." (Tr. 167.) According to Linda, Danielle said to defendant, "motherfucker, you killed him, that boy is dead, you killed him." Id. When asked whether she heard defendant say anything to Danielle, Linda answered, "He said that he did it for her and he loved her." (Tr. 168-169.)
 {¶ 6} Danielle Holloway testified that defendant was living with her on June 5, 2003, and had been living with her "[f]or a long time." (Tr. 332.) However, she admitted that she told police after the shooting that he lived with his mom and not with her. Danielle testified that Mr. Hopkins had made threats to her regarding defendant. She testified that Mr. Hopkins said that he was going to kill defendant, and he showed her a gun. According to Danielle, she communicated this information to defendant. Regarding whether she and defendant had argued on the day of the homicide, Danielle testified that "[i]t was sort of like an argument. I mean, it wasn't nothing real big, we just had a misunderstanding." (Tr. 323.) Danielle recalled the temperature on the day of the homicide as being "Hot." (Tr. 324.) According to Danielle, she, defendant, and her infant son were in the front living room of her home when Mr. Hopkins walked into the house without knocking.[1] After Mr. Hopkins entered the home, defendant stood up, and Jumada knocked on the door. Danielle went to the door, and Jumada asked for a beer. Danielle heard gunshots, ran to the porch, turned around, and saw Mr. Hopkins laying on the ground.
 {¶ 7} Defendant testified at trial. He testified that in June 2003 his permanent residence was 1014 Miller Avenue. When asked how long he lived at that residence, he answered that it was "on and off" for approximately 16 months. Defendant had known Mr. Hopkins for about six months prior to the shooting. According to defendant's testimony, Mr. Hopkins had directly and indirectly threatened him in the past. Defendant testified regarding various incidents in which Mr. Hopkins had threatened him, including two times when Mr. Hopkins displayed a weapon on his waistband.
 {¶ 8} Defendant testified as follows regarding the circumstances surrounding the shooting. According to defendant's testimony, Mr. Hopkins, wearing a hooded sweatshirt, entered the residence at 1014 Miller Avenue without knocking. Defendant described an "eerie silence" when Mr. Hopkins entered the residence. (Tr. 446.) Defendant said to Mr. Hopkins, "please, man, please, just don't do this in front of my son. * * * [P]lease don't do this in front of my son." (Tr. 447.) Defendant offered Mr. Hopkins money, acted as though he was getting his wallet, obtained the gun that was on the couch, and told Mr. Hopkins to leave. Defendant testified that Mr. Hopkins said, "put that shit down before I blaze your ass." (Tr. 448.) Defendant pointed the gun's laser sighting on Mr. Hopkins and again told him to leave. Mr. Hopkins responded by saying, "give me that shit or I pop your ass." Id. According to defendant's testimony, "[a]s soon as he said that, he like pulled, like going for a gun, and I fired, and I had turned to the side. It was fast. Before you know it, seconds later, I'm outside and I'm like oh, my God, this has just happened, call the police. I put the gun down on the porch." Id. Defendant testified that he did not see Mr. Hopkins with a gun, but he believed that he had a gun based on his mannerisms and previous encounters where he had displayed a gun on his person. When the police arrived at the scene, defendant directed them to Mr. Hopkins, identified himself as the shooter, and informed them of the location of the gun.
 {¶ 9} Columbus Police Officer Richard Hilsheimer was the first police officer to arrive at the scene of the shooting. He found Mr. Hopkins laying on his stomach in a pool of blood, with the lower half of his body inside the house and the upper half of his body outside the house. A black semiautomatic handgun[2] was laying on the porch next to Mr. Hopkins. Officer Hilsheimer found no weapon on the victim or any other weapon at the scene. Defense counsel attempted to cross-examine Officer Hilsheimer regarding his training on the issue of use of deadly force. The state objected, and the court ruled that testimony of Officer Hilsheimer regarding his training, as a police officer, was irrelevant to this case.
 {¶ 10} At trial, defense counsel stated an intent to call Vincent DePascale, a former instructor at the Ohio Peace Officers Training Academy, who would testify regarding the use of force. In response, the trial court stated as follows:
[T]he case is a self-defense. Under the law of Ohio, law of Ohio will be given to this jury, this jury will determine whether or not the Defendant's conduct in this case is commensurate with the law of Ohio as to self-defense, not some expert coming in here and taking the jury's function away from them and telling them, yes, he did, or no, he didn't; nor could the State bring such a witness in for that purpose.
(Tr. 234.) A report of Mr. DePascale was proffered into evidence.
 {¶ 11} Dorothy Dean, M.D., a former deputy coroner in Franklin County, performed an autopsy on Mr. Hopkins. She testified that Mr. Hopkins suffered six gunshot wounds to his body, two of which may have been companion wounds.[3] Mr. Hopkins suffered gunshot entrance wounds to (1) his left arm, (2) his left armpit, (3) his left chest, (4) his left hip, (5) his left thigh, and (6) his left buttock.[4] Many of Mr. Hopkins's internal organs were damaged, and his thighbone was broken. Mr. Hopkins died as a result of the gunshot wounds to his torso, including the injury to his lungs, heart, and liver. Dr. Dean opined that the gunshot wounds inflicted in the left armpit, the left chest, and the left hip could have independently killed Mr. Hopkins.
 {¶ 12} The jury returned a verdict of guilty as to count one, murder with specifications. In separate proceedings, the court found defendant guilty as to count two, having a weapon while under disability. On July 12, 2004, the trial court sentenced defendant to 15 years to life in prison as to count one, with an additional three years for the use of the firearm and 11 months in prison as to count two. The court ordered the sentences to run consecutively. Defendant received 396 days of credit for time served.
 {¶ 13} Defendant timely appeals and has asserted the following six assignments of error:
ASSIGNMENT OF ERROR ONE
THE TRIAL COURT ERRED WHEN IT ALLOWED PREJUDICIAL QUESTIONS TO THE JURY BY THE STATE DURING VOIR DIRE.
ASSIGNMENT OF ERROR TWO
APPELLANT WAS DENIED THE RIGHT TO A FAIR TRIAL WHEN THE COURT LIMITED DEFENSE COUNSEL'S CROSS EXAMINATION OF A STATE WITNESS AND WHEN THE COURT REFUSED TO ALLOW A WITNESS TO BE CALLED ON BEHALF OF THE DEFENSE.
ASSIGNMENT OF ERROR THREE
APPELLANT WAS DENIED A RIGHT TO A FAIR TRIAL WHEN THE STATE ELICITED TESTIMONY FROM A WITNESS REGARDING APPELLANT'S ALLEGED HISTORY OF VIOLENCE.
ASSIGNMENT OF ERROR FOUR
APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT REFUSED TO GIVE A REQUESTED INSTRUCTION ON SELF DEFENSE.
ASSIGNMENT OF ERROR FIVE
TRIAL COURT ERRED BY GIVING INCOMPLETE INSTRUCTIONS WHEN THE JURY ASKED FOR INSTRUCTIONS ON SELF DEFENSE.
ASSIGNMENT OF ERROR SIX
THE VERDICT IS AGAINST BOTH THE MANIFEST WEIGHT OF THE EVIDENCE AND THE SUFFICIENCY OF THE EVIDENCE AND THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY AND DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE UNITED STATES AND THE OHIO CONSTITUTIONS.
 {¶ 14} Defendant argues in his first assignment of error that the trial court erred in allowing certain questions by the prosecutor during voir dire. Defendant characterizes the questions of the prosecutor as "plant[ing] into the minds of the jury that only those who are guilty demand a trial in an attempt to avoid punishment." (Defendant's brief, at 7.) In support of this contention, defendant cites to the following colloquy that occurred during voir dire:
[PROSECUTOR]: I don't mean to embarrass you. I see you had a speeding ticket. And I've had many, okay. I'm always about ten minutes late, so I'm always speeding. Did you fight the ticket, did you pay the ticket?
PROSPECTIVE JUROR * * *: I paid the ticket.
[PROSECUTOR]: You paid it. Do you think anybody fights a speeding ticket, takes it to court when they know good and well that they were speeding?
PROSPECTIVE JUROR * * *: Oh, I'm sure they do.
[PROSECUTOR]: Why would somebody do that?
PROSPECTIVE JUROR * * *: I have no idea. I didn't do it.
[PROSECUTOR]: What do you think, ma'am?
PROSPECTIVE JUROR * * *: Might get by with it.
[PROSECUTOR]: Might get away with it, sure.
PROSPECTIVE JUROR * * *: My speedometer doesn't work.
[PROSECUTOR]: That's right. That's exactly right, sure. Or they have two more points on the license, it will be suspend[ed], they can't afford that, so —
[DEFENSE COUNSEL]: Judge, can we approach?
THE COURT: Yes.
(Tr. 46-47.)
 {¶ 15} Essentially, defendant argues prosecutorial misconduct. The test for prosecutorial misconduct is whether remarks were improper and, if so, whether those remarks prejudicially affected substantial rights of the accused. State v. Smith (1984), 14 Ohio St.3d 13. The touchstone of the analysis is the fairness of the trial and not the culpability of the prosecutor. Smith v. Phillips (1982), 455 U.S. 209, 102 S.Ct. 940.
 {¶ 16} The prosecutor did not directly comment on defendant's decision to demand a trial. The questions did not "[plant] into the minds of the jury that only those who are guilty demand a trial in an attempt to avoid punishment," as alleged in defendant's brief. The questions were in reference to whether "anybody" might fight a speeding ticket, when he or she knows he or she was speeding. The questions were phrased in generic terms. Moreover, these questions were made in the context of the prosecutor questioning the prospective jurors on the issue of a defendant's constitutional right to a trial by jury. It would be reasonable to view the prosecutor's questions as not inferring guilt from defendant's trial demand. Therefore, the trial court did not abuse its discretion in overruling the objection to the prosecutor's questions.
 {¶ 17} Based on the foregoing, defendant's first assignment of error is overruled.
 {¶ 18} Defendant argues in his second assignment of error that the trial court erred in not permitting a former instructor at the Ohio Peace Officers Training Academy or a police officer to testify on the issue of the use of deadly force. Defendant asserts that, in view of these rulings, "the jury had to decide this case on insufficient and limited information which denied the appellant's constitutional right to a fair trial." (Defendant's brief, at 13.)
 {¶ 19} Preliminarily, we note that this court will not disturb a trial court's evidentiary ruling absent an abuse of discretion. Krischbaum v.Dillon (1991), 58 Ohio St.3d 58, 66. An abuse of discretion connotes more than an error of law; it implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 20} At trial, defendant sought to cross-examine Officer Hilsheimer on his training on the use of deadly force. Defendant also attempted to call Mr. DePascale, a former instructor at the Ohio Peace Officers Training Academy, as a witness to testify on the issue of the use of force, including the "TAC-TAC method." The trial court ruled that a police officer's testimony regarding the use of force was not relevant. The trial court also ruled that Mr. DePascale could not testify.
 {¶ 21} The trial court did not abuse its discretion in these rulings. As reasoned by the trial court, police training and policy on the use of deadly force was not relevant to whether defendant acted in self-defense under Ohio law, and the jury, not an expert, decides whether a defendant acted in self-defense under Ohio law. Therefore, contrary to defendant's contentions, the trial court did not abuse its discretion in ruling that Officer Hilsheimer could not be cross-examined on the issue of use of force, and that Mr. DePascale could not testify regarding the issue.
 {¶ 22} Accordingly, defendant's second assignment of error is overruled.
 {¶ 23} By his third assignment of error, defendant argues that the trial court erroneously allowed into evidence testimony regarding a police report that was filed against defendant in 2002. Defendant argues that the report was being used to bring forth evidence of defendant's character. Defendant seems to be arguing that the trial court committed prejudicial error in allowing into evidence testimony regarding crimes, wrongs or acts, in violation of Evid.R. 404(B), which provides as follows:
Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
The admissibility of other acts evidence is within the sound discretion of the trial court. State v. Matthews (1992), 80 Ohio App.3d 409, 415;State v. Jackson, Franklin App. No. 02AP-867, 2003-Ohio-6183, at ¶ 30.
 {¶ 24} During cross-examination, Danielle testified that she and defendant did not fight, but had "disagreements." (Tr. 377.) Prior to the state attempting to impeach the witness using the contents of a report, defense counsel objected to the state's use of the report on the basis of relevancy. The trial court ruled that Danielle's prior inconsistent statement was admissible for purposes of impeachment. The trial court noted that an other-acts instruction would be given to the jury. The report itself was not admitted into evidence at trial.
 {¶ 25} Pursuant to Evid.R. 607(A) and 613(A), the state was permitted to impeach the witness with a prior inconsistent statement. Danielle testified that she and defendant did not fight. In an attempt to impeach Danielle, the prosecutor for the state asked Danielle whether she had filed a report indicating a physical assault by defendant, and Danielle answered that she had filed such a report. When asked whether the report was true when she filed it, Danielle answered that not all of it was true. When asked what part was not true, Danielle testified that defendant had not kicked her head into a wall but added that he did punch her. Thus, the report was used to impeach Danielle.
 {¶ 26} Furthermore, although Danielle testified regarding another act of defendant, the trial court instructed the jury that the evidence of another act of defendant could not be considered in determining whether defendant committed any act alleged in the indictment.
 {¶ 27} Based on the foregoing, we conclude that the trial court did not abuse its discretion in permitting the state to impeach Danielle with a prior inconsistent statement and in not excluding her testimony regarding another act of defendant.
 {¶ 28} Accordingly, we overrule defendant's third assignment of error.
 {¶ 29} Defendant argues in his fourth assignment of error that the trial court gave erroneous jury instructions. Specifically, defendant argues that the instructions on the issue of self-defense were erroneous and that the trial court should have given an instruction on the defense of another.
 {¶ 30} Citing State v. Fisher (Mar. 12, 1996), Franklin App. No. 95AP-437, as support, defendant's trial counsel requested a jury instruction on defense of another. This court, in Fisher, cited State v.Williford (1990), 49 Ohio St.3d 247, as setting forth the test for determining whether the accused is entitled to use deadly force in defense of another. In Williford, at paragraph one of the syllabus, the Supreme Court of Ohio held:
If a person in good faith and upon reasonable ground believes that a family member is in imminent danger of death or serious bodily harm, such person may use reasonably necessary force to defend the family member to the same extent as the person would be entitled to use force in self-defense.
This is both an objective and subjective test. See State v. Harris
(1998), 129 Ohio App.3d 527, 538.
 {¶ 31} In the case at bar, we find defendant was not entitled to an instruction regarding defense of another. Although the evidence at trial revealed that defendant's infant son was present in the living room when the shooting occurred, there is no evidence in the record indicating a direct threat toward defendant's child. Moreover, we agree with the state's assessment that defendant's testimony regarding his concern for the child was only probative of his subjective belief of imminent danger confronting the child. Therefore, the trial court did not err in not instructing the jury on defense of another.
 {¶ 32} Defendant also argues that the trial court erred in its instruction regarding the duty to retreat. At trial, defendant proposed the following jury instruction on the issue of the duty to retreat:
If a person's assault is without fault and in a place where he has aright to be and is put in reasonably apparent danger of losing his life or receiving great bodily harm, he need not retreat, but may stand his ground, repel force by force, and if in reasonable exercise of self-defense he kills his assailant, he is justified. There is no duty to retreat where the assault is felonious and produced imminent danger of death or great bodily harm. * * *
(Emphasis added.) (Defendant's proposed jury instructions, at 2.) In its instructions to the jury on the issue of duty to retreat, the trial court gave the instruction as proposed by defendant but substituted "in his home," for "in a place where he has a right to be." (Tr. 604; Jury Instructions, at 7.) Defendant argues that the trial court should not have replaced the language "in a place where he has a right to be" with "in his home." We disagree.
 {¶ 33} The trial court properly modified the proposed jury instruction, as defendant's proposed instruction did not provide a correct statement of the law regarding the duty to retreat. See State v.Jackson (1986), 22 Ohio St.3d 281, 283 (holding that an instruction stating that there is no duty to retreat as long as a person is in any place where he has a right to be, is an erroneous statement of the law.) Therefore, the trial court did not err in its instruction to the jury regarding the duty to retreat.
 {¶ 34} Based on the foregoing, defendant's fourth assignment of error is overruled.
 {¶ 35} In his fifth assignment of error, defendant argues that the trial court gave incomplete instructions in response to a jury question and, therefore, defendant was denied a fair trial. "Where, during the course of its deliberations, a jury requests further instruction, or clarification of instructions previously given, a trial court has discretion to determine its response to that request." State v. Carter
(1995), 72 Ohio St.3d 545, paragraph one of the syllabus. "A reversal of a conviction based upon a trial court's response to such a request requires a showing that the trial court abused its discretion." Id. at 553.
 {¶ 36} In its jury instructions, the trial court stated:
To establish self-defense, the Defendant must prove by a preponderance of the evidence, the following: One, the Defendant was not at fault in creating the situation giving rise to the affray; two, the Defendant had an honest belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and three, the Defendant did not violate any duty to retreat * * * or avoid the danger.
(Tr. 603-604.)
 {¶ 37} During its deliberations, the jury submitted the following question to the court: "Does any of 3 standards for establishing self-defense suffice or are all 3 required (and vs or)." (Tr. 620.) The trial court responded, "Yes. All three are needed." The court's response simply clarified to the jury that all three requirements are necessary to establish self-defense.
 {¶ 38} Defendant seems to argue that, in answering the jury question, the trial court should have outlined the three requirements for establishing self-defense, or at least re-instructed the jury on the issue of a defendant's duty to retreat. Considering the fact that the trial court's response to the jury's question was a correct statement of the law, and the fact that the trial court properly charged the jury on the three requirements of self-defense, we can only conclude that the trial court did not abuse its discretion in its response to the question.
 {¶ 39} Therefore, defendant's fifth assignment of error is overruled.
 {¶ 40} Defendant argues in his sixth assignment of error that the verdict is against the manifest weight of the evidence and is not supported by sufficient evidence. In support of this assignment of error, defendant reasserts arguments contained in his second and fifth assignments of error.
 {¶ 41} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different."State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In determining the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law, not fact. Thompkins, at 386.
 {¶ 42} Regarding the weight of evidence, the Supreme Court of Ohio, in Thompkins stated as follows:
* * * Weight of the evidence concerns "the inclination of the greateramount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greateramount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on itseffect in inducing belief." * * *
(Emphasis sic.) Id. at 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594.
 {¶ 43} Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. A jury, as finder of fact, is free to believe all, part, or none of each witness's testimony.State v. Colvin, Franklin App. No. 04AP-421, 2005-Ohio-1448, at ¶ 34. However, when assessing whether a conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and ultimately determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Thompkins, at 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. Furthermore, "`[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id. Thus, "[a] defendant will not be entitled to reversal on manifest weight or insufficient evidence grounds merely because inconsistent testimony was heard at trial." State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21.
 {¶ 44} Regarding defendant's conviction for murder under R.C.2903.02(A), it is undisputed that defendant shot and killed Mr. Hopkins. Defendant testified that he shot Mr. Hopkins. Defendant's argument at trial was that he acted in self-defense. "The elements of the crime and the existence of self-defense are separate issues. Self-defense seeks to relieve the defendant from culpability rather than to negate an element of the offense charged." State v. Martin (1986), 21 Ohio St.3d 91, 94. In this case, the jury was presented with inconsistent testimony regarding the circumstances of Mr. Hopkins' death. Defendant testified regarding various instances when Mr. Hopkins, in the months leading up to the shooting, had threatened defendant and had revealed a gun in his waistband. The jury could have concluded that it was unreasonable for defendant to believe that he was in imminent danger of death or great bodily harm. It was also within the province of the jury to conclude, after weighing the evidence, that defendant did not have a bona-fide belief that he was in imminent danger. The jury, as the trier of fact, reasonably rejected defendant's self-defense claim and found him guilty of murder.
 {¶ 45} Regarding defendant's conviction for having a weapon while under disability, R.C. 2923.13 provides, in part:
(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
* * *
(2) The person is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence.
 {¶ 46} In this case, it is undisputed that defendant used a firearm to shoot and kill Mr. Hopkins. Furthermore, a judgment entry, indicating that defendant was adjudicated a delinquent child after he admitted to committing an attempted rape, was admitted into evidence, without objection, in defendant's trial regarding the weapon under disability charge. (See State's Exhibit W-1.) At the proceeding concerning count two in the indictment, defendant testified to his belief that his counsel in juvenile court was inadequately prepared and did not properly advise him regarding the plea. In view of this testimony, defense counsel argued that defendant's plea in the juvenile proceedings was an uncounseled plea, subject to collateral attack regarding its validity. The representation made by defendant's counsel in juvenile court, as revealed in the admitted judgment entry, indicated that defendant had been advised of his rights and the possible consequences of entering an admission plea. (See id.) Defendant's counsel at the proceeding regarding count two also argued that defendant's possession of the firearm was out of necessity, in view of defendant's testimony that he had the firearm in order to defend himself. This argument related to the disputed issue of fact at trial as to whether defendant shot Mr. Hopkins in self-defense.
 {¶ 47} In view of the evidence at trial, we find that defendant's murder conviction, with firearm specifications, and conviction for having a weapon while under disability was supported by sufficient evidence. Furthermore, upon our thorough review of the record, we conclude that neither the jury nor the trial court "lost its way" in finding defendant guilty of murder, with firearm specifications, and having a weapon while under disability. This is not a case where the evidence weighs heavily against defendant's convictions for murder, with specifications, and having a weapon while under disability. Accordingly, defendant's sixth assignment of error is overruled.
 {¶ 48} Based on the foregoing, we overrule defendant's six assignments of error, and hereby affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Brown, P.J., and Sadler, J., concur.
[1] Danielle described Mr. Hopkins as having "a lot of clothes on" considering the temperature. (Tr. 326.)
[2] When firing a shot with a semiautomatic gun, the shooter must pull the trigger once for each shot taken.
[3] Companion wounds are wounds that are inflicted from the same bullet.
[4] The numbering of the wounds does not relate to the sequence in which the wounds were inflicted.