[Cite as *State v. Smith*, 2025-Ohio-4556.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee/ Cross-Appellant, | : | No. 23AP-599 |
| | : | (C.P.C. No. 21CR-2610) |
| v. | | |
| | : | (REGULAR CALENDAR) |
| Elias M. Smith, | | |
| | : | |
| Defendant-Appellant/ Cross-Appellee. | : | |

D E C I S I O N

Rendered on September 30, 2025

**On brief:** [*Shayla D. Favor*], Prosecuting Attorney, and *Benjamin Tracy*, for plaintiff-appellee/cross-appellant. **Argued:** *Benjamin Tracy*.

**On brief:** *Mitchell A. Williams*, Public Defender, and *Leon J. Sinoff*, for defendant-appellant/cross-appellee. **Argued:** *Leon J. Sinoff*.

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant/cross-appellee, Elias M. Smith ("Smith"), appeals from a judgment of the Franklin County Court of Common Pleas convicting him of murder and the discharge of a firearm on or near a prohibited premises. Plaintiff-appellee/cross-appellant, State of Ohio, challenges the trial court's decision admitting expert testimony.

**I. Facts and Procedural History**

{¶ 2} On June 29, 2021, the Franklin County Grand Jury indicted Smith on three charges. Count 1 accused Smith of murder, alleging he "did purposely cause the death of Jason Edward Keys," a violation of R.C. 2903.02 and an unclassified felony. (Indictment

at 1.) Count 2 accused Smith of murder, alleging he "did cause the death of Jason Edward Keys, as a proximate result of . . . Felonious Assault," a violation of R.C. 2903.02 and an unclassified felony. (Indictment at 1.) Count 3 accused Smith of discharging a firearm on or near a prohibited premises for firing "upon or over a public road or highway and the violation caused serious physical harm," a violation of R.C. 2923.162 and a first-degree felony. (Indictment at 2.) Counts 1, 2, and 3 each included a three-year firearm specification pursuant to R.C. 2941.145(A). These charges arose from the events of June 20, 2021 near Walnut Hill Park Drive that resulted in the death of Jason Edward Keys ("Jason"). Smith pled not guilty.

{¶ 3} On July 11, 2023, the state filed a motion in limine to exclude the report and testimony of Dr. Delaney Smith ("Dr. Delaney") (no relation to appellant Smith), one of the witnesses the defense planned to call to testify at trial. On July 17, 2023, the trial court heard arguments from both sides and denied the state's motion. The court conducted a jury trial from July 17 to 21, 2023. The following facts were elicited from evidence presented at trial.

{¶ 4} The state called Charae Williams Keys ("Charae") as its first witness. During her testimony, Charae was a 36-year-old social worker employed by OhioHealth. She grew up in her grandparents' home. Robert Thomas ("Mr. Thomas"), along with his wife Dr. Olivia Thomas ("Dr. Thomas") and their two daughters, lived just across the street and two doors down. Charae testified she was friendly with the Thomas daughters while growing up in the neighborhood. She even invited the Thomas family to her wedding in 2017. At the state's prompting, Charae recalled two instances prior to June 20, 2021 in which Mr. Thomas clashed with Charae or her family. In 2011, Charae alleged that Mr. Thomas brake checked her as she drove on the highway and made an obscene gesture in her direction. Charae informed her grandfather, Cordell Williams ("Charae's grandfather" or "Cordell"), about Mr. Thomas's actions, prompting him to walk across the street and discuss the matter with Mr. Thomas. Later, on Thanksgiving in 2018, Charae recounted her husband Jason using the Thomas's driveway to turn his car around, an act that angered Mr. Thomas and led him to verbally confront Jason. Charae next attested to the events of June 20, 2021. It was Father's Day, so she asked Jason to accompany her to visit her grandfather. Twelve members of Charae's family gathered at her grandparents'

house that day, and Jason parked his car on the driveway behind Charae's aunt's vehicle. After the family's dinner ended, Jason moved his car and parked in the street in front of the grandparents' home to allow Charae's aunt to exit the driveway. Jason re-entered the home and told Charae it was time to leave. Charae said she exited the home with Jason, her mother, and her grandfather and walked down the driveway to the car. Jason had just started the car when Mr. Thomas appeared near the passenger side of the car, holding a rifle and two magazines, clumsily trying to load them into the rifle. Charae asked Mr. Thomas what he was doing there, to which Mr. Thomas replied "[h]e didn't tell you?" (Tr. Vol. 3 at 502.) Jason came around the car and swatted the magazines out of Mr. Thomas's hands. Jason and Mr. Thomas then began struggling over the rifle while Charae called aloud for help. Charae's mom screamed upon witnessing the brawl. Charae's grandfather entered the fray and told Charae to call 911. Charae crouched behind the car and called 911, and she described next hearing "pop, pop, pop, pop, pop." (Tr. Vol. 3 at 486.) She stood up and was hit with shrapnel, causing her to fall back down. Charae brought herself around the car and screamed as she saw Jason lying lifeless, "blood everywhere," with his left arm "half blown off." (Tr. Vol. 3 at 487.) Mr. Thomas left and walked back to his house, the rifle and magazines still lying on the street. Charae held Jason's body and yelled at those around her to get away. Her grandfather yelled at Smith, asking him why he did that. Charae testified Smith was standing with his hands on his head, "looking all shocked." (Tr. Vol. 3 at 489.) Charae's grandfather took Smith's gun from him, and Smith went back inside his house. Police eventually arrived, secured the scene, and put Charae into a police car until a detective could speak with her. Charae testified that Jason was licensed to carry a concealed firearm but she had no recollection of Jason ever taking his gun out during this confrontation. Charae's grandfather is also licensed to carry a concealed firearm but was not carrying a weapon during the scuffle with Mr. Thomas. At one point, before Jason was shot, he instructed Charae's mother to bring him his firearm, but Charae's mother did not bring the firearm out of the home until after Jason had been shot. The state next played video clips of the incident taken by an adjacent home's security system. The jury also heard the audio recording of Charae's 911 call. Charae testified to the verity of the security footage video and the 911 audio. Next, Smith's attorney cross-examined Charae. Charae acknowledged she was ducked down behind the

car for much of the scuffle involving Mr. Thomas, Jason, and her grandfather, so her firsthand experience of that portion of the fight is based only on what she heard, rather than on what she witnessed.

{¶ 5} The state also called Charisse Penn to the stand. Penn is Charae's mother and the daughter of Charae's grandparents, Verna and Cordell Williams. Penn testified she was standing in the kitchen as Charae and Jason left the home, accompanied by her mother, Verna. Penn remembered Verna yelling out that Mr. Thomas "has a gun on Jason." (Tr. Vol. 3 at 556.) Penn, hearing this, yelled to her father, Cordell, and peeked around the corner to see Mr. Thomas in a conflict with Jason involving a gun. Penn claimed she ran out of the house, followed closely thereafter by Cordell. Once outside, Penn tried screaming and yelling in an attempt to "divert Mr. Thomas's attention off of whatever he is doing with Jason and Charae." (Tr. Vol. 3 at 557.) Penn recounted Charae being pushed away from the fracas, and eventually Jason and Mr. Thomas simultaneously fell to the ground, scattering the personal belongings of Mr. Thomas—his keys and wallet—in the street. Then, in Penn's telling, both Jason and Mr. Thomas got up off the ground, and Jason held his hands together with either a magazine or a firearm in his grasp, pointed at the ground. Penn eventually remembered she told the police the day of the incident that Jason had indeed pulled out his concealed firearm and had it pointed at the ground. Penn continued, recounting that her father instructed Mr. Thomas to gather his things and go home. As Mr. Thomas was picking up his items, Jason was shot, prompting confused cries from Penn and Cordell. After the shots were fired, Penn saw Smith standing in the doorway of his home holding a firearm. Penn claimed Cordell then told her to go into the home and bring out his gun. Not finding a handgun, Penn instead retrieved a rifle. Cordell informed her she retrieved the wrong gun, but by that point, police arrived and ordered Penn to drop the weapon and get on her knees.

{¶ 6} The state next called Frederick Lynn Kaufman II to testify. He has served as a police officer with the Columbus Division of Police for nearly 18 years. Officer Kaufman testified he was on patrol on June 20, 2021 with Officer Michelle Reynolds-Parra when they received a call regarding a shooting on Walnut Hill Park Drive. Both officers activated their body-worn cameras upon arriving at the scene, the video of which was shown to the jury. Officer Kaufman upon arrival identified two individuals holding firearms, and he and

Officer Reynolds-Parra alternated securing the scene and performing CPR on Jason. Once medics took Jason away, Officer Kaufman separated the witnesses to prevent coordination of their stories. He also called the SWAT team because they had been informed Smith had barricaded himself in his house, though he acknowledged Smith after about an hour and one-half exited his home and willingly surrendered to police. On cross-examination, Officer Kaufman described his interaction with Daniel Smith ("Daniel"), Smith's brother, who had jumped out the back window of his house when he heard gunfire. Daniel told Officer Kaufman that Smith had returned inside the house along with their two sisters. Officer Kaufman testified that after receiving this information, another officer took Daniel to be isolated in a police car while Officer Kaufman stood guard on the scene.

{¶ 7} The state's next witness was Todd Cress, a crime scene search unit detective. His primary job responsibilities include processing the scenes of major crimes like homicides, robberies, and rapes by photographing and collecting evidence. In this case, Detective Cress testified he went to the scene with three other detectives. Detective Cress described what each of the 122 photographs taken at the scene depicted. He explained they discovered seven shell casings just inside the front door of the Smith's house. Of the four firearms recovered from the scene of the crime—those belonging to Mr. Thomas, Cordell, Jason, and Smith—only Smith's AR-15 had no serial number. Detective Cress described the lack of a serial number as "not normal." (Tr. Vol. 3 at 637.)

{¶ 8} The state also called Officer Reynolds-Parra to the stand. At the time of her testimony, she had served as a Columbus police officer for over 12 years. Her partner that day was Officer Kaufman, and they were the first officers to respond to the scene. Officer Reynolds-Parra described that as they arrived, she saw "an older male black and a female black off to the left of the scene with guns in their hands." (Tr. Vol. 4 at 655.) Officer Reynolds-Parra was the first officer to reach Jason, and she rolled his body over and prepared to conduct CPR. As she rolled him over, her body-worn camera footage captured black items on the ground near Jason. By his foot was what Officer Reynolds-Parra believed to be a firearm holster. By Jason's knee, she testified she saw a small firearm. Under his elbow was a cell phone. Officer Reynolds-Parra eventually asked Officer Kaufman to take over performing CPR as she provided cover, fearing the scene could be unsafe as they had yet to apprehend the shooter. After about 20 minutes, medics arrived and took over

resuscitation efforts, and the officers remained at the scene for roughly three hours establishing a perimeter and gathering information from witnesses. Officer Reynolds-Parra admitted neither she nor any other officer tried to communicate with anyone in Smith's home prior to SWAT's arrival. She testified it took about one hour for SWAT to arrive.

{¶ 9} The state called Caleb Worley to testify. Worley worked as a forensic scientist in the firearms identification section of the Columbus Division of Police's crime laboratory. After establishing Worley's credentials, the state without objection asked the trial court to declare him a firearms and tools examiner expert. Worley examined Smith's AR-15 and promptly noticed the gun was missing information that is typically displayed on firearms: the gun's serial number, make, and model. Worley also noticed the lower receiver of the weapon had a "rough finish[]." (Tr. Vol. 4 at 683.) In his opinion, Worley surmised Smith's AR-15 was assembled at home using a gun-building kit. Nevertheless, he determined the AR-15 was operable. Worley, in fact, determined that all four firearms recovered from the crime scene were operable.

{¶ 10} The state called Ronald A. Lemmon, Jr. to the stand as its final witness. He is a homicide detective with the Columbus Division of Police, with over 28 years of experience as a police officer. Detective Lemmon arrived at the perimeter of the scene of the crime where he waited until SWAT arrested the suspect and secured the area. Based on his review of the case, Detective Lemmon testified the 911 call was made at 3:37 p.m., and Smith exited the home and surrendered to the SWAT team at 5:14 p.m.—a delay of about 1 hour and 37 minutes. Once Smith was arrested and transported downtown for questioning, Detective Lemmon proceeded to the crime scene and acquainted himself with the area and the witnesses. He then traveled to police headquarters downtown, where he first interviewed Mr. Thomas who had been taken in and interviewed as a witness. In Detective Lemmon's opinion, Mr. Thomas's rationale for his actions that day were "[a]bsolutely not" rational. (Tr. Vol. 4 at 720.) After his discussion with Mr. Thomas, Detective Lemmon interviewed Smith. He began the interview by reading Smith his *Miranda* rights. The interview with Smith was recorded and entered into the record without objection. Detective Lemmon highlighted some inconsistencies between Smith's interview and the video and physical evidence. For one thing, Smith claims he saw a woman

with a pump-action rifle before he opened fire, but Detective Lemmon noted both video and testimonial evidence revealed there was no pump-action rifle and Penn did not carry her father's rifle out of the house until after Smith shot Jason.  Furthermore, the rifle carried by Penn never reached the street where the fight had taken place, as police were on the scene and had Penn drop the weapon in her parents' driveway.  A second inconsistency noted by Detective Lemmon involved the number of shots fired.  Detective Lemmon claimed Smith said he fired only three shots, but eight shell casings were recovered from inside the front door of Smith's home.

{¶ 11}  The state rested its case.  Smith's attorney moved for a Crim.R. 29 dismissal which the trial court denied.  At this point, the state renewed its motion in limine that asked the court to exclude the report and testimony of Dr. Delaney, arguing that psychiatric testimony cannot be used to support a self-defense claim except for battered woman syndrome or child battered syndrome, neither of which was applicable here.  Defense counsel conceded the court should issue an instruction limiting this expert testimony to consideration of the characteristics, circumstances, and conditions of Smith at the time of the incident.  The court ruled in favor of the defense and allowed the testimony of Dr. Delaney to proceed, with the limiting instruction that the jury could only consider the expert testimony to discern Smith's "particular characteristics, knowledge or lack of knowledge, circumstances, history, and conditions at the time of the incident."  (Tr. Vol. 4 at 793.)

{¶ 12}  The defense called Dr. Delaney as its first witness.  In preparation for this case, Dr. Delaney interviewed Smith and reviewed his medical records.  She did not personally conduct testing on Smith because she believed the medical records were sufficient to diagnose him with post-traumatic stress disorder ("PTSD") and traumatic brain injury ("TBI").  Dr. Delaney recounted Smith's medical reports described an assault he suffered while in the military led to his diagnoses of both PTSD and TBI.  She began by discussing potential symptoms of PTSD generally, including the claims that a person with PTSD may have "increased hypervigilance" and thereby be "very easily startled" and "always on the lookout for some kind of danger."  (Tr. Vol. 4 at 805.)  Specifically in regard to Smith, Dr. Delaney alleged Smith "had a heightened startle response" and feared "danger around every corner."  (Tr. Vol. 4 at 806.)  Dr. Delaney next described TBI as potentially

causing "difficulty with judgment" and impairment of memory, concentration, and motor functions. (Tr. Vol. 4 at 807.) As to Smith's specific TBI symptoms, Dr. Delaney cited his headaches, ringing in his ears, blurry vision, irritability, and impulsivity. Defense counsel had Dr. Delaney reiterate that her testimony on Smith's symptoms was not based on any testing she conducted, but rather on her review of Smith's existing medical records. Dr. Delaney imagined Smith's PTSD and TBI colored his reaction to the scene he witnessed in the street. She speculated Smith was thinking, "I have got to act now because people are in danger, my family is in danger, my neighbors are in danger, I have to make a decision at this moment." (Tr. Vol. 4 at 813.) The state cross-examined Dr. Delaney who acknowledged Smith's medical records lacked any definitive diagnosis of PTSD and contained conflicting evidence regarding his diagnosis of TBI. The state further elicited the fact that Dr. Delaney did not watch the video of the shooting in this case, nor did she listen to the recording of Smith's police interrogation after the shooting.

{¶ 13} The defense next called Eliza Smith to testify. Eliza is Smith's sister who was 16 years old at the time she testified at trial and 14 years old at the time of the shooting. She recounted Smith was more depressed and irritable upon returning from his military service. Eliza testified that on June 20, 2021, she was at her family's home with her four siblings: Naomi, Daniel, Malachi, and Smith. Upon witnessing the fight break out on the street, Eliza was on the home's ground level with Smith. They did not exchange any words, but Eliza remembered she was afraid and ran upstairs to her younger sister, Naomi. Eliza and Naomi hid in a bedroom closet where they eventually heard loud gunshots. After the shots were fired, Smith told Eliza and Naomi to go hide in the basement. They complied and hid in the basement until police arrived. On cross-examination, Eliza clarified she saw "the old man," referring to Mr. Thomas, in possession of a gun and in confrontation with Jason and Charae. (Tr. Vol. 4 at 874.) Eliza claimed she had no memory of police knocking or asking anyone inside the home to come outside. She believed Smith stored his guns and ammunition in the basement where he lived, and so would likely have had to go downstairs after witnessing the fight scene outside, retrieve the gun, and then return to the home's ground level.

{¶ 14} The defense next called Naomi Smith to the stand. Naomi is Smith's sister who was 14 years old when she testified at trial and 12 years old at the time of the shooting.

Naomi was in her bedroom when she heard screaming outside. Eliza then came upstairs, and their brother Malachi told them to get down. Naomi and Eliza hunkered down in the bedroom closet together. They heard gunshots, and soon thereafter Smith yelled from downstairs that Naomi and Eliza should go hide in the basement. They stayed in the basement for more than 45 minutes, and Naomi could hear police sirens outside and a helicopter over their home. She claims she never heard anyone speaking over a bullhorn until, eventually, someone speaking over a speaker told Smith first, then the other siblings, to come outside. On cross-examination, Naomi testified Smith came to the basement a couple times while she, Eliza, and Malachi were hiding out, and informed them he killed someone and would be going to jail. Naomi believed Smith knew police were outside because he spent most of his time in the house on the ground level where he could presumably see the scene outside.

{¶ 15} Finally, the defense called Elias Smith to the stand. Smith testified his siblings look up to him and he sees his role as a protector of his family. Smith was 26 years old at the time of his testimony. He testified that when he was 17 years old, he worked at Walmart and walked to and from work. One day as he walked home, he was ambushed and knocked unconscious by three men. This left him afraid to go outside. Eventually, on October 16, 2016, Smith enlisted in the United States Marine Corps. While Smith was training as a Marine at a military base, he claims he was exiting the camp's living quarters while wearing shower shoes when another Marine, who Smith "kind of knew," stepped in Smith's path. (Tr. Vol. 5 at 922.) Smith alleged this Marine "suddenly grab[bed]" him by the head and wrapped his arms around Smith's neck. (Tr. Vol. 5 at 923.) The Marine began to choke Smith. Smith claims he blacked out and "smacked [his] head on the concrete" floor. (Tr. Vol. 5 at 923.) Smith testified he was diagnosed with a TBI. He claims he told his doctors he was injured by "horseplay" because, in Smith's own words, the other Marine "didn't want me to snitch." (Tr. Vol. 5 at 926.) Smith also testified his TBI resulted in lasting symptoms of headaches, confusion, and numbness in the extremities, but that he "never got that checked up on." (Tr. Vol. 5 at 930.) Smith was eventually discharged from the Marine Corps and moved back into his mother's home on Walnut Hill Park Drive. Smith bought an AR-15 firearm ostensibly for home defense in summer 2019. He

purchased the AR-15 as an assembly kit because he saw such assembly as a hobby. Prior to the shooting on June 20, 2021, Smith had never fired this weapon.

{¶ 16} On the day of the shooting, Smith testified he was in his home's ground level when he heard his sister yell from upstairs that there were people outside with guns. Smith next heard a "horrifying scream" from a woman outside, so he ran down to his room in the basement to retrieve his phone and firearm. (Tr. Vol. 5 at 952.) Unable to find his phone, he grabbed his AR-15, charged the rifle, and walked upstairs to the front door. Smith described feeling "pretty panicked" as he opened the front door. (Tr. Vol. 5 at 957.) Smith stepped out of his home and partially closed the door behind him. Standing outside on his front porch, Smith noticed "three or four males, two females" in the street. (Tr. Vol. 5 at 958.) Smith recalled that one woman, Charae, was wearing a gray shirt and standing near the front, left side of the parked car. Smith worried "she was hurt or assaulted" because she seemed to be panicking and "clenching her abdominal area." (Tr. Vol. 5 at 959.) The only person Smith could identify was Cordell Williams. Smith also saw Mr. Thomas, whom he described as "an older black man, darker skin." (Tr. Vol. 5 at 960.) Smith next described Jason, "a fairer skinned male . . . bald head, behind the left rear passenger side of his car." (Tr. Vol. 5 at 960.) Smith witnessed another woman in a pink shirt, Penn, and relayed that she was panicking and screaming. Other than Cordell, Smith learned the identities of all these individuals only after the fact. Smith heard Cordell say "drop the gun," and he deduced that because Jason appeared to be "holding an object" with "his left rear passenger door" open, Smith believed Jason was holding a gun and "trying to raise the firearm." (Tr. Vol. 5 at 961.) Smith elaborated:

> The only person I saw as a threat at that time was the person that I was completely unfamiliar of, never saw him, never saw his face, never spoke to him, brandishing a firearm, left rear passenger . . . door open, appearing to have retrieved or attempting to retrieve a firearm out of the car.

(Tr. Vol. 5 at 963.) Based on the fact there were multiple firearms outside, Smith believed others were in imminent danger of being shot. Smith raised his weapon's muzzle and fired an indeterminate number of shots at Jason until he dropped and became immobile. Smith aimed for the torso and pelvic area. Smith heard screaming and a voice asking why someone just shot their husband. Smith approached the scene but was not keen on

observing the injuries to the victim because Jason's "arm was messed up," and as he neared the group, Cordell asked Smith if he was the shooter. (Tr. Vol. 5 at 968.) Cordell explained Jason was not the threat, and Smith claims it was only then he realized he had made a mistake. Smith complied with Cordell's order to drop his weapon and go back in his house. Upon returning inside, Smith explained what happened to his siblings Malachi, Eliza, and Naomi, and took them all down in the basement and told them to stay there until the situation was resolved. Smith returned to the ground level and, looking out a window, observed two police officers outside. One officer used a lawn chair from another house as a rest to aim an "AR type rifle" at Smith, but, when Smith with both hands up, yelled out the window and asked for permission to safely exit the home, he received no reply. (Tr. Vol. 5 at 974.) Smith wondered at this point why officers were not allowing him to leave his house. Smith testified the officers could clearly see him through his window, and he repeatedly yelled out to ask if it was safe to exit the home. After a long while, Smith heard police on a bullhorn command him to exit the home with his hands up. He complied and was placed in the back of a police cruiser. On the stand, Smith expressed remorse for his actions and wished he could take the whole situation back.

{¶ 17} Next, the state cross-examined Smith. Smith testified he believed he was defending Cordell, Charae, and Penn by firing at Jason that day. When pressed by the state, Smith admitted he also intended to defend Mr. Thomas, though Smith was quick to point out that if he had known all the facts, he would have viewed Mr. Thomas as the threat rather than Jason. The state then initiated the following exchange:

> [THE STATE:] So your justification for murdering Jason Keys is defense of another, and the "others" are the people outside; is that right?
>
> [SMITH:] I don't know about murder, sir.
>
> [THE STATE:] No. No. It's murder.

(Tr. Vol. 5 at 987.) At that point, Smith's counsel objected to the use of "murder" to describe the shooting. Later, the state similarly described Smith's shooting as "murder and firing across a roadway," which prompted another objection from Smith's counsel. (Tr. Vol. 5 at 998.) The trial court initially sustained this second objection, but after an off-the-record sidebar conference, the court overruled the objection and allowed the state's counsel to

proceed. The state next called into question Smith's testimony about where he stood as he fired the shots: Smith claims he stepped out onto his front porch prior to firing, whereas the state suggested that because the evidence depicted the spent shell casings inside the home's entryway, Smith must have fired from inside his home's threshold. Despite repeated attempts by the state to have Smith answer whether his killing of Jason was reasonable, Smith declined to answer. Once the state completed its cross-examination, the defense rested its case.

{¶ 18} After both sides rested, the trial court and the parties proceeded to review the proposed jury instructions outside the presence of the jury. The first point of contention involved the barricade instruction, as Smith's counsel asserted the state presented no actual evidence that Smith barricaded himself in the home and so an instruction on that issue would be improper. The court disagreed and allowed the barricade instruction to remain. Next, the parties agreed and the court indicated its intent to strike references to self-defense and instead reference only defense of another, the only affirmative defense Smith asserted in this case. After some wording clarifications and disagreements over the prevailing case law as it relates to defense of another, the court finalized its jury instructions. The parties next presented their closing arguments to the jury. Finally, the court instructed the jury in the law of the case and the jury began its deliberations.

{¶ 19} On July 24, 2023, the jury delivered a verdict of guilty on two counts of murder, both with firearm specifications, and one count of discharge of a firearm on or near prohibited premises with a firearm specification. On September 25, 2023, the trial court sentenced Smith to an indefinite term of 21 years to life in prison. Smith timely appealed. The state timely cross-appealed.

## II. Assignments of Error

{¶ 20} Smith assigns the following eight errors for our review:

> [I.] Pervasive Errors and Deficiencies in the Jury Instructions Violated Mr. Smith's Constitutional Rights to a Fair Trial and Due Process of Law.

> [II.] Defense Counsel's Failure to Object to Pervasive Errors and Deficiencies in the Jury Instructions Constituted Constitutionally Ineffective Assistance of Counsel.

[III.] Permitting the Jury to Impute Guilt to Mr. Smith, via a So-Called "Barricade Instruction," Undermined Appellant's Presumption of Innocence and Eroded the Prosecution's Burden of Proof, thus Denying Appellant His Constitutional Rights to a Fair Trial and Due Process of Law.

[IV.] The Prosecutor's Pervasive and Inflammatory Misstatements of Law Asserting that Appellant "Murdered" the Deceased, *Irrespective of* Appellant's Claim of Defense-of-Others, Deprived Mr. Smith of His Constitutional Rights to a Fair Trial and Due Process of Law.

[V.] Defense Counsel's Failure to Object, On All Occasions But One, to the Prosecutor's Pervasive, Prejudicial Misstatements of Law Was Constitutionally Ineffective Assistance of Counsel.

[VI.] Mr. Smith Was Denied the Effective Assistance of Counsel via Defense Counsel's Failure to Adequately Prepare the Sole Expert Psychiatric Witness for Her Testimony, When Counsel Failed to Apprise Her of the Existence of Key Case Materials Indispensable to a Proper Expert Review, or to Instruct Her to Personally Conduct Testing to Reconfirm Mr. Smith's Psychiatric Diagnoses.

[VII.] Mr. Smith Was Deprived of a Fair Trial, Due Process of Law, and the Effective Assistance of Counsel via Cumulative Error and Cumulative Ineffectiveness.

[VIII.] Mr. Smith's Convictions Are Contrary to the Manifest Weight of the Evidence.

(Emphasis in original.)

{¶ 21} The state, as cross-appellant, assigns the following error for our review:

The trial court's decision admitting expert testimony and opinions that failed to meet the requirements set forth in Evid.R. 702(A) constituted an abuse of discretion.

## III. Analysis

{¶ 22} In his first assignment of error, Smith asserts the trial court erred in failing to instruct the jury on how to apply its finding on his defense-of-another affirmative defense.

{¶ 23} Smith did not object to this particular aspect of the jury instructions and consequently forfeited all but plain error. *State v. Love*, 2017-Ohio-8960, ¶ 20 (1st Dist.); *See* Crim.R. 30(A). Plain error exists when (1) there is error, (2) the error is an obvious defect in the trial proceedings, and (3) the error affects substantial rights. *State v. D.W.*, 2019-Ohio-2193, ¶ 7 (10th Dist.), citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). An error impacts substantial rights if the defendant establishes a reasonable probability the error affected the outcome of the trial. *Barnes*; *State v. Roundtree*, 2021-Ohio-3825, ¶ 86 (10th Dist.). For this court to reverse on the basis of plain error, the error must undermine confidence in the trial's outcome. *Roundtree*. Appellate courts recognize plain error with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *D.W.*, citing *Barnes*.

{¶ 24} In the present case, the trial court instructed the jury on the defense-of-another affirmative defense. After describing the various elements and definitions of defense of another, the court explained: "[t]he State need only disprove one element of the defense by proof beyond a reasonable doubt. Defense of another does not deny the existence of the act, it simply provides a justification for it." (Tr. Vol. 5 at 1140.) The court omitted any instruction for how the jury ought to proceed after making its decision on the defense-of-another affirmative defense. While this court "recognize[s] that the Ohio Jury Instructions are not binding legal authority," we nevertheless find consistency with the language of the Ohio Jury Instructions ("OJI") to be significant. *State v. Patterson*, 2025-Ohio-280, ¶ 67 (10th Dist.), citing *State v. Aekins*, 2023-Ohio-322, ¶ 118 (10th Dist.). Here, the relevant OJI would instruct a jury it "must find the defendant not guilty" if the state failed to prove the defendant did not act in defense of another. *2 Ohio Jury Instructions*, CR § 421.191(15) (Rev. Nov. 5, 2022). The court's jury instructions contained no such directive.

{¶ 25} As to the first element of the plain error analysis, we find the trial court erred by providing an incomplete jury instruction that failed to direct the jury on how to apply a potential finding of defense of another. *See Love* at ¶ 21-22. This omission "left the jury uninformed as to how proof of the affirmative defense operates in relation to the verdict which that proof requires." (Internal quotations deleted and citation omitted.) *Love* at ¶ 22.

{¶ 26} Second, the error is an obvious defect in the trial proceedings. "Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the fact finder." *Sanders v. Fridd*, 2013-Ohio-4338, ¶ 18 (10th Dist.), citing *State v. Comen*, 50 Ohio St.3d 206 (1990), paragraph two of the syllabus. Essential to the jury's duty as factfinder is the application of its factual conclusions to the verdict. Because the trial court failed to fully explain this crucial step, we find the error to be an obvious defect.

{¶ 27} Third, the error impacts Smith's substantial rights because there was a reasonable probability it affected the outcome of the trial. Though it would be folly to confidently predict the result of a hypothetical error-free trial, this court believes the omission of a vital jury instruction—explaining how an affirmative defense relates to the verdict—certainly risks causing a manifest miscarriage of justice. *D.W.*, 2019-Ohio-2193, at ¶ 7 (10th Dist.), citing *Barnes*, 94 Ohio St.3d at 27. Without such an instruction, it is conceivable the jury found Smith satisfied the elements of defense of another and yet, lacking guidance from the court about the significance of that conclusion, improperly rendered a verdict of guilty. There was enough evidence presented in this case to support a jury's conclusion that Smith satisfied the elements of defense of another. The element primarily at issue here was whether Smith, "in good faith and upon reasonable ground," believed the people he claimed to be defending were in imminent danger of death or great bodily harm. *State v. Young*, 2005-Ohio-5489, ¶ 30 (10th Dist.). Smith testified to his belief that Cordell, Charae, and Penn were in imminent danger of being shot. He testified to his belief that Jason was holding a firearm, and that he heard Cordell instruct someone to "drop the gun." (Tr. Vol. 5 at 961.) Smith testified he observed Jason "trying to raise the firearm." (Tr. Vol. 5 at 961.) Smith came upon a chaotic scene involving multiple firearms and panicked screams. If the jury believed Smith's testimony, it may have concluded Smith was justified in firing his weapon in defense of another.

{¶ 28} The dissent, conversely, concludes the omission of the jury instruction did not with reasonable probability prejudice Smith and undermine confidence in the trial. It reaches this conclusion in part because it does not believe "there is a reasonable probability the jury would have found that it was objectively reasonable for [Smith] to believe that Charae, Penn, Cordell, and Mr. Thomas were in imminent or immediate danger of death or

great bodily harm." (Dissent at ¶ 29.) Specifically, the dissent supports its belief by underscoring the following facts: (1) two of the individuals Smith claimed to be defending were holding firearms; (2) Cordell's weapon was pointed down at the ground; (3) Smith believed Penn and Cordell were trying to stop Jason from hurting someone; and (4) Charae, crouched behind the car, would not have been in what Smith feared was Jason's line of fire. A reasonable jury, however, could have acknowledged all these facts and still found Smith acted in defense of another. First, possession of a firearm does not negate the danger posed by another person with a firearm. Even holding a firearm, a person may nevertheless be in imminent danger of death or great bodily harm. Second, the fact that Cordell's weapon was pointed at the ground may indicate he was not in imminent danger, as the dissent suggests, or it may indicate some other hypothetical altogether. A reasonable jury could have interpreted the direction of the barrel of Cordell's firearm to mean any number of things, including scenarios in which Cordell was in great danger. Third, Smith believed Penn and Cordell were trying to stop Jason from firing a weapon, yet a reasonable jury might have concluded, based on Smith's perception of the incident, their attempted interventions were unsuccessful and Smith felt compelled to intervene. Fourth, even if Charae was not directly in what Smith believed to be Jason's line of fire, the jury may still have believed that in Smith's mind, Charae could have been in mortal danger had a bullet pierced through the car door or had the line of fire quickly changed. A thorough review of the evidence leads us to conclude the jury could have interpreted the complex facts of this case any number of ways, including that Smith's actions were justified by the defense-of-another affirmative defense. Thus, there was a reasonable probability the trial court's failure to properly instruct the jury affected the outcome of the trial.

{¶ 29} Other courts have found similar jury instruction errors to be reversible even without explicitly employing the typical "reasonable probability" plain error standard. They found incomplete instructions like the one here "prevented the jury from properly applying the law to reconcile any finding on the affirmative defense with its finding that the state had proved the elements of [murder] beyond a reasonable doubt." *Love*, 2017-Ohio-8960, at ¶ 23 (1st Dist.); *see State v. Roberts*, 109 Ohio App.3d 634, 639 (6th Dist. 1996) ("[T]he trial court's erroneous instructions prevented the jury from properly applying the law and thereby affected [the] appellant's substantial rights and resulted in a manifest

miscarriage of justice."). Given the present case involves a trial for murder, these are indubitably "exceptional circumstances" that demand the correction of an error as potentially significant as this one. *D.W.* at ¶ 7.

{¶ 30} Accordingly, because we find the court committed plain error by failing to properly instruct the jury, we sustain Smith's first assignment of error. We are thus obligated to reverse Smith's convictions and remand for a new trial.

{¶ 31} Smith's seven remaining assignments of error allege ineffective assistance of counsel, jury instruction errors, prosecutorial misconduct, cumulative error, and a challenge based on the manifest weight of the evidence. Our decision to sustain Smith's first assignment of error, and consequently to vacate his convictions and remand for a new trial, means these seven other assignments of error are "no longer live." *Columbus Prosecutors Office v. J.M.*, 2023-Ohio-3555, ¶ 31 (10th Dist.). "[A]n assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court." *State v. Gideon*, 2020-Ohio-6961, ¶ 26; *see State v. Solt*, 2023-Ohio-2779 (10th Dist.) (rendering moot a challenge to the manifest weight of the evidence). Accordingly, we render as moot Smith's second, third, fourth, fifth, sixth, seventh, and eighth assignments of error.

{¶ 32} In its sole cross-assignment of error, the state asserts the trial court abused its discretion in admitting expert testimony and opinions that failed to meet the requirements of Evid.R. 702(A). Having sustained Smith's first assignment of error, the state's cross-assignment of error is no longer a live issue. Accordingly, we render as moot the state's sole cross-assignment of error.

## IV. Conclusion

{¶ 33} Having sustained Smith's first assignment of error, we render as moot his second, third, fourth, fifth, sixth, seventh, and eighth assignments of error. We likewise render as moot the state's sole cross-assignment of error. Accordingly, we vacate Smith's convictions and sentence, reverse the judgment of the Franklin County Court of Common Pleas, and remand for a new trial in accordance with law and consistent with this decision.

*Judgment reversed;*
*cause remanded.*

DINGUS, J., concurs.
DORRIAN, J., concurs in part and dissents in part.

Dorrian, J., concurring in part and dissenting in part.

{¶ 34} I concur in part and dissent in part. I concur with the majority that the trial court committed obvious error by omitting the jury instruction on how to apply the defense-of-another affirmative defense. However, I dissent that the error affected Smith's substantial rights and further explain below the reasons for my conclusion. First, I will address the state's arguments that as a matter of law Smith was not legally entitled to assert the defense-of-another affirmative defense. Second, I will consider the entire record and will address whether Smith has demonstrated a reasonable probability that the error resulted in prejudice to him.

## I. Smith was legally entitled to assert the defense-of-another affirmative defense

{¶ 35} The state argues that, as a matter of law, Smith cannot show he was prejudiced by the erroneously omitted jury instruction language because he was not legally entitled to act in defense of Charae, Penn, Cordell,[1] or Mr. Thomas by using force against Jason. *See* State's Brief at 14-19, 23-24. First, the state argues that Smith could not have legally acted in defense of Charae, Penn, Cordell, or Mr. Thomas because "none of Jason's family members had a 'bona fide belief that he [or she] was in imminent danger of death or great bodily harm' at the hands of Jason Keys." (State's Brief at 16-17.) Second, the state argues that Smith could not have legally acted in defense of Charae, Penn, Cordell, or Mr. Thomas because Jason did not start the affray. Third, the state argues that Smith could not have legally acted in defense of Mr. Thomas because Mr. Thomas started the altercation. Fourth, the state argues that Smith could not have legally acted in defense of Charae, Penn, Cordell, or Mr. Thomas because Smith reinitiated or escalated the fight.

{¶ 36} I begin by noting the instructions the trial court gave at trial regarding defense of another:

> To prove defendant's use of deadly force was not in defense of another, the State must prove only one of the following: One, the persons he is claiming to have defended were at fault in creating the situation given rise to the affray; two, the defendant did not have reasonable grounds to believe that the people he claimed to have defended were in imminent or immediate danger of death or great bodily harm; or three, the defendant did not have an honest belief, even if mistaken, that

---

[1] Smith, several witnesses, and the state refer to Cordell as "Williams" or "Sterling."

the people he claims to have defended were in imminent danger of death or great bodily harm; four, the people he claimed to have defended violated the duty to retreat; or five, the defendant used unreasonable force.

(Tr. Vol. 5 at 1137-38.) The instructions went on to describe each element of the defense in greater detail.[2]

{¶ 37} In its first argument, the state argues that Smith was not entitled to act in defense of Charae, Penn, Cordell, and Mr. Thomas because they did not have a *bona fide* belief they were in imminent danger at the hands of Jason. The relevant instruction which the trial court gave regarding the bona fide belief requirement was: "To prove defendant's use of deadly force was not in defense of another, the State must prove only one of the following . . . three, the *defendant* did not have an honest belief, even if mistaken, that the people he claims to have defended, were in imminent danger of death or great bodily harm." (Emphasis added.) (Tr. Vol. 5 at 1138.) This instruction to consider the bona fide belief of Smith, as the defendant, is consistent with our case law and with the Ohio Jury Instructions. *See State v. Harris*, 129 Ohio App.3d 527, 537 (10th Dist. 1998) ("it is the *defendant's* good faith and reasonable belief in the imminent danger to the person defended and the concomitant need for the use of force, *not the knowledge or belief of the person being defended*, that warrants the instruction on the privilege") (emphasis added); *State v. Williford*, 49 Ohio St.3d 247, 250 (1990); *2 Ohio Jury Instructions*, CR § 421.211 (Rev. Jan. 25, 2025). Therefore, the state's argument that the focus of the instruction should be to consider the bona fide belief of Charae, Penn, Cordell, and Mr. Thomas is incorrect.

{¶ 38} Furthermore, what the state argues now is different from what it argued for and agreed to at trial. During the jury instructions conference, the state agreed that the third element of the defense should be stated as follows: [Prosecutor Zeyen:] . . . "The *defendant* did not have an honest belief, even if mistaken, that the people he claims to have defended were in imminent or immediate danger or bodily harm." (Emphasis added.) (Tr. Vol. 5 at 1058.) The state also directed how the element should be described in greater

---

[2] Smith provides examples from the Ohio Jury Instructions of the omitted language, including *2 Ohio Jury Instructions*, CR § 421.211, which states in relevant part: "If you find that the state failed to prove beyond a reasonable doubt any of the elements of (insert name of applicable offense[s]) *or if you find that the state failed to prove beyond a reasonable doubt that the defendant did not act in defense of another, you must find the defendant not guilty*." (Emphasis added.)

detail: "We should insert, 'Then if the objective standard[3] is met, then you must subjectively consider if the *particular defendant* had an honest belief that the persons he claims to have defended were in imminent danger.' " (Emphasis added.) (Tr. Vol. 5 at 1077.)

{¶ 39} The jury instructions given by the trial court, to which the state agreed, directed the jury to view the circumstances through the lens of Smith's bona fide or "honest" belief, even if mistaken (a subjective view). Yet the state now argues that the affirmative defense requires a jury to view the circumstances through the lens of the persons defended. As noted above, Supreme Court of Ohio and Tenth District Court of Appeals case law holds otherwise. Furthermore, the state agreed to the instructions requiring the jury to view the circumstances through the lens of Smith's honest belief, and, therefore, the state waived the argument it now makes.

{¶ 40} Accordingly, I am not persuaded by the state's argument that Smith was not entitled to act in defense of Charae, Penn, Cordell, and Mr. Thomas because they did not have a bona fide belief they were in imminent danger at the hands of Jason.

{¶ 41} In its second argument, the state argues that Smith was not entitled to act in defense of Charae, Penn, Cordell, and Mr. Thomas because Jason did not start the affray. The relevant instruction which the trial court gave regarding the "at fault" requirement was: "To prove defendant's use of deadly force was not in defense of another, the State must prove only one of the following . . . One, *the persons he is claiming to have defended* were at fault in creating the situation given rise to the affray[.]" (Emphasis added.) (Tr. Vol. 5 at 1137.) This instruction to consider whether the persons defended were at fault starting the affray, and not the deceased, is consistent with our case law and with the Ohio Jury Instructions. *See State v. Wenger*, 58 Ohio St.2d 336, 339-40 (1979) ("A person who intervenes in a struggle and has no duty to do so, acts at his own peril if the person assisted was in the wrong. . . . The recurring theme is that one who intervenes to help a stranger

---

[3] Regarding the second element, or the objective standard, the state also agreed that the jury should consider whether Smith, not the persons he protected, had reasonable grounds to believe that the people he claimed to have defended were in imminent or immediate danger of death or great bodily harm. At the jury instruction conference, Smith's counsel noted that "it's the defendant is the one who has reasonable grounds to believe. It's not the person he is claiming to defend would have reasonable grounds to believe," and further, "the test of reasonable grounds isn't whether or not the person being defended knew, it's what -- it's the defendant." (Tr. Vol. 5 at 1056.) The prosecutor responded in agreement: "Right. The *defendant* did not have reasonable grounds to believe that the person he claims to have defended was in imminent or immediate danger of death or great bodily harm." (Emphasis added.) (Tr. Vol. 5 at 1056.)

stands in the shoes[4] of the person whom he is aiding, and if *the person aided is the one at fault*, then the intervenor is not justified in his use of force and is guilty of an assault.") (Emphasis added.); *Harris*, 129 Ohio App.3d at 538 ("a defendant is entitled to an instruction on the privilege [of defense of another] if there is evidence sufficient to allow a reasonable jury to find that: . . . *the person defended was not at fault* in creating the situation giving rise to the death of the victim[.]" (Emphasis added.); *2 Ohio Jury Instructions*, CR § 421.211 (Rev. Jan. 25, 2025). Therefore, the state's argument that the focus of the instruction should be to consider whether Jason started the affray is incorrect.

{¶ 42} Furthermore, again, what the state argues now is different from what it argued and agreed to at trial. During the jury instructions conference, the state requested that the focus regarding who was at fault be on Charae, Penn, Cordell, and Mr. Thomas.

> [Prosecutor] Zeyen: So the language will be, "The defendant stands in the shoes of the person *he claims to have defended*. The defendant did not act in defense of another if the State proved beyond a reasonable doubt that *the people he claims to have defended* were the ones at fault in creating the situation that resulted in the injury or death. . . . *The people he claims to have defended* were at fault if they were the initial aggressors and did not escalate the situation by being the first to use deadly force."

(Emphasis added.) (Tr. Vol. 5 at 1076.)

{¶ 43} The jury instructions given by the trial court, to which the state agreed, directed the jury to stand in the shoes of the persons being defended and determine if they started the affray. Yet the state now argues that the affirmative defense requires the jury to stand in the shoes of Jason, the deceased, and determine if he started the affray. As noted above, Supreme Court of Ohio and Tenth District Court of Appeals case law holds otherwise. Furthermore, as noted above, the state agreed to the instructions requiring the

---

[4] The "stands in the shoes of the person whom he is aiding" instruction applies to the first element of defense-of-another affirmative defense—that the persons being defended must not have been at fault. However, at trial and before this court on appeal, the state attempts to extend the "stand in the shoes of the person whom he is aiding" instruction to the other elements of defense of another. To no avail. The "stand in the shoes of the person whom he is aiding" perspective applies only to the first element regarding "fault" and the fourth element regarding "duty to retreat." The second element regarding "reasonable belief" and the fifth element regarding "reasonable force" are objective standards. Finally, the third element regarding "bona fide belief" requires the fact finder to stand in the shoes of the defendant, the person asserting the defense, not the shoes of the person whom he is aiding.

jury to consider whether Charae, Penn, Cordell, and Mr. Thomas were at fault, and, therefore, the state waived the argument it now makes.

{¶ 44} Accordingly, I am not persuaded by the state's argument that Smith was not entitled to act in defense of Charae, Penn, Cordell, and Mr. Thomas because Jason was not at fault in starting the affray.

{¶ 45} In its third argument, the state argues that Smith was not entitled to act in defense of Charae, Penn, Cordell, and Mr. Thomas because Mr. Thomas started the altercation. As noted above, the relevant instruction which the trial court gave regarding the "at fault" requirement was: "To prove defendant's use of deadly force was not in defense of another, the State must prove only one of the following . . . One, the persons he is claiming to have defended were at fault in creating the situation given rise to the affray[.]" (Tr. Vol. 5 at 1137.) The state is correct that the evidence reveals that Mr. Thomas started the altercation or the affray. However, the state concedes in its brief that Smith testified that he was defending not only Mr. Thomas, but also Charae, Penn, and Cordell too. (State's Brief at 15, citing Tr. Vol. 5 at 962-64, 985-87, 996-98, 1041-43.) Although the evidence showed that Mr. Thomas started the affray, there was no evidence, and the state does not argue, that the other persons Smith claimed he defended started the affray.

{¶ 46} Accordingly, I am not persuaded by the state's argument that Smith was not entitled to act in defense of Charae, Penn, and Cordell because Mr. Thomas started the altercation.

{¶ 47} In its fourth argument, the state argues that Smith was not entitled to act in defense of Charae, Penn, Cordell, and Mr. Thomas because Smith reinitiated or escalated the fight. Unlike the state's first three arguments addressed above, which raised legal questions regarding the proper wording of the instructions, this argument raises an evidentiary question.

{¶ 48} The state requested, Smith agreed, and the court instructed the jury that "Defendant is not in a position to claim defense of another if he sought trouble and, armed with a dangerous weapon, provoked a fight or renewed a fight that had broken off and did not attempt to avoid the trouble." (Tr. Vol. 5 at 1076-77.)

{¶ 49} The state argues that Smith was not in a position to claim the defense because the evidence revealed that the altercation between Mr. Thomas and Jason was effectively

over and had calmed before Smith fired his weapon at Jason.  Therefore, the state posits that Smith reinitiated and escalated the affray when he fired his weapon.   In support, the state points to Exhibit Z1, a composite video containing splicing of neighbors' Ring and Vivent security cameras.[5]  According to the state, the composite video reveals a five-second "island of calm" during which Smith could have reflected on whether he needed to fire his weapon.  However, our review of the composite video reveals anguished screaming for help prior to the sound of gunshots.

{¶ 50}  The state also points to various portions of the transcript.  But our review of the transcript reveals differing testimony from the state's two witnesses who were present at the scene regarding whether the pause suggested by the state existed, as well as a different perspective from Smith.  On direct examination, Penn testified that her father, Cordell, intervened when Thomas was approaching Jason with his gun in hand.  She stated that after this intervention, Thomas dropped his gun and then "the whole situation had been deescalated.  Everything was done.  When [Mr. Thomas and Jason] fell to the ground [and] [g]ot back up."  (Tr. Vol. 3 at 567.)  She further testified that Mr. Thomas was collecting the personal items he had dropped when she heard a shot and saw her son-in-law fall to the ground.  On cross-examination, Penn added that, at the time Mr. Thomas was picking up his items, she picked up Mr. Thomas's gun.  She testified that at that point "Jason's gun -- or what appears to be a gun or whatever was in his hands is pointed down, the shots ring out."  (Tr. Vol. 3 at 584.)

{¶ 51}  Charae had a different recollection of the sequence of events.   On direct examination, Charae testified regarding the chaotic situation:

> [Charae]: [Mr. Thomas] has got two clips in his hand, magazines, and he is trying to load them into a rifle. And I say, What are you doing? What are you doing? What's going on?
>
> And he says, He didn't tell you?
>
> And I'm like, Tell me what?
>
> At this point, Jason is on this side. His car has an automatic start, so what he had done was he had started the car, but when he realized Mr. Thomas was there, he actually, like -- when you

[5] The video footage is taken from a distance and the images are not clear or close-up.  The audio reveals screaming but it is not clear exactly what is being said or who is saying it.

have a push-to-start, you put the key -- you start it, and then he basically, getting out of the car, like, hits the clip out of Robert Thomas's hands to get it to fall so he won't be attacked.

Q: So does he hit the clip when Mr. Thomas is trying to load that clip into the rifle?

[Charae]: Yes. Yes. He has got the rifle in the air actively trying to load the magazine.

Q: And that's when Jason --

[Charae]: He backhands it.

Q: -- backhands this clip?

[Charae]: Yes.

Q: What happens next, looking back in your mind?

[Charae]: *I start saying - - I start saying, Help. Help.* They are struggling over the gun. I keep saying, Help. Help.

I run around the car. *My mom, I hear her, she starts screaming.* The next thing I know, my grandpa is somehow in the picture. And it's like my grandpa is here. Jason is in the middle. Mr. Thomas is on this side, so it's kind of like a sandwich of people. My grandpa is trying to get the gun away from Mr. Thomas. And my grandpa says, Call 9-1-1.

So I call 9-1-1. And I drop down -- so the action is happening on this side of the car. I drop down behind the butt of the car, the passenger side back wheels, and start calling 9-1-1.

*There is commotion, and then the next thing I know, it's pop, pop, pop, pop, pop.* And at one point, I even stood up, and I was hit with shrapnel and fell down because I thought I had been shot.

. . .

I go around the side of the car, and Jason is lying there dead[.]

(Emphasis added.) (Tr. Vol. 3 at 485-86.) Charae's testimony did not reveal the "island of calm" the state suggests.

{¶ 52} Furthermore, the state's argument overlooks that Smith was not a part of the group on the street attempting to deescalate the situation with Mr. Thomas. Rather, he was viewing the affray from his porch and the evidence demonstrates that he did not have the same perspective on the course of the altercation as those Smith thought he was defending.

{¶ 53} On direct examination, Smith described what he saw when he stepped onto his porch to see who was screaming and why:

> A: Okay. I see -- I see a woman panicking -- a woman wearing a gray shirt panicking, which I later found out to [be] Ms. Keys.
>
> . . .
>
> A: She is screaming. She is panicked. I don't know what's going on. She seemed to be, from what I remember, like, clenching her abdominal area. I'm thinking maybe -- and she is panicking at the same time. I was thinking maybe she was hurt or assaulted. Something to that extent. And that worried me a lot. Then I see -- the only person I can clearly identify, the only person I kind of knew out there was Mr. Williams.
>
> . . .
>
> A: I see Mr. Williams with a rifle down by his side but not pointed at anyone.
>
> . . .
>
> A: Okay. I see [Ms. Penn]. And she is panicking. Everybody is panicking out there. She appears to be holding some kind of rifle, which . . .
>
> Q: Okay.
>
> A: I'm still -- there is still panicking going on. Still screaming. And that's when I hear Mr. Williams -- I hear Mr. Williams say something like, Put the gun down or drop the gun. And at the same time, I see Mr. Keys.
>
> Q: When you say Mr. Keys, you later learned it is Mr. [Jason] Keys --
>
> A: Correct.
>
> . . .

A: Correct. I saw Mr. Keys while Mr. Williams was saying, Drop the gun. I put two and two together in my head. I saw him holding an object as if it were a firearm in his left rear passenger seat -- I mean, his left rear passenger door is open, so it appears to me that he just retrieved a weapon out of his car, and now he is trying to raise the firearm. He is holding something.

. . .

A: After I hear "put the gun down" and I see that, that's when - - that's when I decide to take - - take action.

Q: So you fired your weapon?

A: I did.

Q: Why is it that you fired your weapon at that point in time? What were you fearing?

A: Well, the panic, multiple different -- multiple different factors. The panic of everyone. The position. Mr. Keys was facing north. Everybody else was facing south. And by the way, . . . Robert Thomas, he was staggered from Mr. Keys' position. He was staggered facing west. So he wasn't directly in front of him.

Q: Okay.

A: At that point in time, he was unarmed. I didn't have any prior knowledge of what happened when I came out. But by that time, he was already unarmed. So I didn't see him as a threat. I wouldn't see Mr. Sterling as a threat. The only person I saw as a threat at that time was [Jason] that I was completely unfamiliar of, never saw him, never saw his face, never spoke to him, brandishing a firearm, left rear passenger seat open -- left rear passenger door open, appearing to have retrieved or attempting to retrieve a firearm out of the car.

(Tr. at Vol. 5 at 959-63.)

{¶ 54} On cross-examination, the prosecutor asked Smith, "And you didn't bother to even ask a question about what Robert Thomas was doing, not one inquiry?" (Tr. Vol. 5 at 1043.) Smith answered, "There wasn't much time from just what I was seeing that I felt -- I genuinely thought that someone was going to be hurt right then and there." (Tr. Vol. 5 at 1043.) Smith further testified:

> A. I shoulder -- I shouldered my weapon when I heard "drop the gun" and still the screaming was continuing. There is still a lot of commotion. The situation was not deflated -- diffused, sorry, not deflated. The situation was not diffused by -- from what I saw, from what I heard from -- you can see it on camera, the situation doesn't sound diffused. There is still screaming going on. You can see in the Ring camera footage. You can hear it in the Vivent footage that shortly before the shots were fired, the situation doesn't sound diffused.
>
> And if the situation was so diffused, why was a woman still crouched behind the car looking as if she was in fear of her life? It doesn't make any sense. The situation didn't look diffused at all.

(Tr. Vol. 5 at 1028.) Smith's testimony does not support what the state suggested should have been an "island of calm."

{¶ 55} Accordingly, I am not persuaded by the state's argument that Smith was not entitled to act in defense of Charae, Penn, Cordell, and Mr. Thomas because Smith reinitiated or escalated the fight.

{¶ 56} Having rejected the state's four arguments, I would find that Smith was legally entitled to assert the defense-of-another affirmative defense. But the inquiry as to whether Smith suffered prejudice as a result of the claimed error does not end here.

## II. Review of the entire record reveals Smith has not demonstrated a reasonable probability that the error resulted in prejudice to him

{¶ 57} The standard for the substantial rights or prejudice prong of the plain error analysis has been stated in varying ways over the years, but this court has settled that the "sounder legal standard" is as follows:

> an accused seeking to show that an obvious error affected his or her substantial rights (and thereby, the outcome of the criminal proceeding) must "demonstrate a reasonable *probability* that the error resulted in prejudice," such that there is a "probability of a different result [that] is sufficient to undermine confidence in the outcome of the proceeding."

(Emphasis in original.) *State v. Taylor-Hollingsworth*, 2020-Ohio-278, ¶ 12 (10th Dist.), quoting *State v. Myers*, 2018-Ohio-1903, ¶ 130. The United States Supreme Court has held that "a defendant[-appellant] must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is 'sufficient to

undermine confidence in the outcome' of the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004), quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984).[6]   Therefore, informed by the entire record regarding the defense-of-another affirmative defense, I consider whether there is a reasonable probability that the omission of the instruction on how to apply the defense-of-another affirmative defense resulted in prejudice such that the probability of a different result is sufficient to undermine confidence in the outcome of the proceeding.

{¶ 58}  By asserting the affirmative defense, Smith did not deny the existence of the act and, therefore, it is not necessary to consider whether the elements of the offense of murder were proven.  Accordingly, I will focus on the evidence related to the elements of the defense of another and, in particular, the second element regarding whether it was reasonable for Smith to believe Charae, Penn, Cordell, and Mr. Thomas were in imminent or immediate danger of death or great bodily harm.

{¶ 59}  With regards to the second element—whether it was reasonable for Smith to believe Charae, Penn, Cordell, and Mr. Thomas were in imminent or immediate danger of death or great bodily harm, the instructions addressed the second and third elements together and stated:

---

[6] In *Taylor-Hollingsworth*, we traced the development of the plain error doctrine under Crim.R. 52(B) and concluded that the standard set forth in *State v. Long*, 53 Ohio St.2d 91, 96-97 (1978), was no longer good law. In *Long*, the Supreme Court of Ohio considered whether a particular jury instruction determined to be erroneous constituted plain error and in so doing considered whether the appellant had shown that "but for the error, the outcome of the trial *clearly would have been otherwise*." (Emphasis added.) *Taylor-Hollingsworth* at ¶ 9. We observed in *Taylor-Hollingsworth* that the rule against inquiry into jury verdicts and the inherent difficulty of proving a hypothetical make it virtually impossible to prove that a jury would "clearly" have reached a different decision "but for the error." *Id.*, citing *Long* at 96-97. We further observed that despite courts continuing to cite the *Long* precedent, the Supreme Court of Ohio, in *State v. Rogers*, 2015-Ohio-2459, ¶ 22, adopted the language of the United States Supreme Court in *Dominguez Benitez*, "in order to clarify that an accused need only show a reasonable probability (rather than a clear proof) that but for an error, the outcome of the trial would have been otherwise." *Taylor-Hollingsworth* at ¶ 10. We also noted that, two years after *Rogers* in *State v. Thomas*, 2017-Ohio-8011, the Supreme Court of Ohio again noted the *Dominguez Benitez* language and emphasized: "Even if the error is obvious, . . . the accused is 'required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims.' " (Emphasis in original.) *Taylor-Hollingsworth* at ¶ 10, quoting *Thomas* at ¶ 33. Recently, the Supreme Court of Ohio repeated the same standard as that adopted in *Taylor-Hollingsworth* and informed by *Rogers* and *Thomas* in *State v. Drain*, 2022-Ohio-3697, ¶ 52, and *State v. Brunson*, 2022-Ohio-4299, ¶ 25. Accordingly, in considering whether prejudice resulted in this case, I am mindful that Smith is not required to show that the outcome of the trial clearly would have been otherwise, but rather need only show that there is a reasonable probability that the error resulted in prejudice—such that there is a probability of a different result that is sufficient to undermine confidence in the outcome.

> Two and three, Reasonable Grounds and Honest Belief: These elements of self-defense are a combined subjective and objective test. You must first consider the defendant's situation objectively, that is, whether considering all the defendant's particular characteristics, knowledge or lack of knowledge, circumstances, history, and conditions at the time of the attack, from an objective standpoint, whether he reasonably believed the people he claimed to have defended were in imminent danger. Then if the objective standard is met, you must then subjectively consider if this particular defendant had an honest belief that the people were in imminent danger. The testimony of Dr. Delaney Smith was admitted for the limited consideration regarding the defendant's particular characteristics, knowledge or lack of knowledge, circumstances, history and conditions at the time of the attack. Dr. Delaney Smith's testimony cannot be considered for any other purpose.
>
> Another component contained within these second and third elements is the defendant's bona fide belief that the use of force was the only means of escape. Part of this entails showing the defendant used only the force that is reasonably necessary to repel the attack. You must consider the conduct of Jason Keys and determine if his acts and words caused the defendant to reasonably and honestly believe that the people he claimed to have defended were about to be killed or to receive great bodily harm.

(Tr. Vol. 5 at 1139-40.)

{¶ 60} Smith testified as follows. His sisters told him "[t]here are people with guns outside," and he heard "loud disturbing scream[ing]." (Tr. Vol. 5 at 950, 952.) He did not know who it was and thought it could have been his mom. Smith went to his room and grabbed his rifle. He looked for his phone to call 911 but could not find it. When he went back upstairs, he continued to hear screaming which made him think that something bad was happening outside and someone was in danger. He felt "pretty panicked." (Tr. Vol. 5 at 957.) When he opened the door and looked out, he saw one of the two females screaming and panicked. He said he did not know what was going on. Smith stated, "She seemed to be, from what I remember, like, clenching her abdominal area. I'm thinking maybe - - and she is panicking at the same time. I was thinking maybe she was hurt or assaulted. Something to that extent. And that worried me a lot." (Tr. Vol. 5 at 959-60.) Smith testified that he saw Cordell "with a rifle down by his side but not pointed at anyone." (Tr. Vol. 5 at

960.) He saw Penn "[a]nd she is panicking. Everybody is panicking out there. She appears to be holding some kind of rifle[.]" (Tr. Vol. 5 at 960-61.) Smith heard Cordell say something like, "[p]ut the gun down or drop the gun," and that is when he saw Jason. (Tr. Vol. 5 at 961.) Smith testified that he saw Jason "while Mr. Williams was saying, Drop the gun. I put two and two together in my head. I saw him holding an object as if it were a firearm in his left rear passenger seat -- I mean, his left rear passenger door is open, so it appears to me that he just retrieved a weapon out of his car, and now he is trying to raise the firearm. He is holding something. . . . I do believe there was a firearm." (Tr. Vol. 5 at 961-62.) Smith testified that, after he heard "put the gun down," he decided to take action and he fired his weapon. (Tr. Vol. 5 at 962.) He described Jason in that moment as follows: "The only person I saw as a threat at that time was the person that I was completely unfamiliar of, never saw him, never saw his face, never spoke to him, brandishing a firearm, left rear passenger seat open -- left rear passenger door open, appearing to have retrieved or attempting to retrieve a firearm out of the car." (Tr. Vol. 5 at 963.) "To me, it looked like there was possibly a *standoff with multiple firearms.*[7] . . . *And they were trying to stop this man from hurting somebody, that's what I thought.*" (Emphasis added.) (Tr. Vol. 5 at 963-64.) When asked if he believed that the people were in imminent danger of being shot, killed, seriously injured, Smith replied "correct" "[g]iven the fact that there were multiple firearms outside . . . [a]nd the panicking[.]" (Tr. Vol. 5 at 964.) He stated:

> A. Well, I didn't know who [Jason] was, but in my mind, I'm shooting a man who is brandishing a firearm, he is seen as a threat, and there are women screaming, someone is saying, Drop the gun. I am unfamiliar with this man, and he seemed like a threat. It appeared to me that he retrieved a firearm out of his car, left rear passenger seat. And that's -- hearing the "drop the gun" and multiple other things with the screaming

---

[7] There were several guns recovered at the scene. One state's exhibit depicted a Norinco "SKS" rifle, which was brought to the scene by Mr. Thomas to accost Jason. This is the gun that Jason and Cordell disarmed Mr. Thomas of prior to Jason being shot. It was located to the side of and close to the front driver's side of the car. Another state's exhibit depicted a "pump action" Marlin model .22 caliber which was brought to the scene by Penn at the direction of Cordell. It was located at the upper part of the driveway close to the Williams' home. Another state's exhibit depicted two 30-round magazines flipped and taped together, essentially a 60-round magazine, for the SKS rifle brought to the scene by Mr. Thomas. It was located near the rear driver's side door and rear tire of the car. The taped magazine is in the form of a crescent with two butts protruding, one at each end of the concave of the crescent. It appears to be slightly larger than another gun, a "small caliber handgun," a KelTec .380 pistol which belonged to Jason that was located near and just behind the rear driver's side tire close to the magazine. The photos also depicted a cell phone, Mr. Thomas's driver's license, a pair of sunglasses, and a set of Volvo keys on the ground.

and all of that, in my mind, I thought right then and there that
Mr. Keys was a threat.

(Tr. Vol. 5 at 989-90.)

{¶ 61} On cross-examination, Smith testified that it was not his specific purpose to kill Jason but that "[i]t was -- my purpose was to stop who I saw as an imminent threat to other people and that's it. Not specifically to kill, but just to stop him." (Tr. Vol. 5 at 987-88.) Smith's testimony was largely consistent with the interview conducted by Detective Lemmon shortly after the shooting.

{¶ 62} Based on Smith's testimony alone, I cannot say with regard to the second element that there is a reasonable probability that omission of the instruction resulted in prejudice such that the probability of a different result is sufficient to undermine confidence in the proceeding. The jury heard Smith testify that he saw Jason retrieve a weapon out of his car, that he thought Jason was trying to raise the firearm and, at that time, based on his belief that Jason was a threat, he decided to take action and fire his weapon. Smith also testified, however, that even though both Penn and Cordell had firearms, Penn was screaming and Cordell's weapon was pointed down. He specifically testified that "[t]o me, it looked like there was possibly a standoff with multiple firearms," and that "*they* were trying to stop this man from hurting somebody, that's what I thought." (Emphasis added.) (Tr. Vol. 5 at 963-64.) The evidence also revealed that Charae was crouched behind the car on the opposite side from Jason. Considering Smith's own testimony, I cannot say that there is a reasonable probability the jury would have found that it was objectively reasonable for him to believe that Charae, Penn, Cordell, and Mr. Thomas were in imminent or immediate danger of death or great bodily harm—since two of them also had firearms. That Cordell's weapon was pointed down leads to a reasonable conclusion that Cordell was not feeling threatened. Furthermore, in Smith's mind, "they"—meaning Penn and Cordell—were trying to stop Jason from hurting someone—and therefore it would not be reasonable to conclude his intervention was needed. Furthermore, Charae was taking cover behind the other side of the car and would not have been in what Smith thought would be Jason's line of fire. Nevertheless, in addition to Smith's testimony, I will also consider the evidence regarding his particular characteristics, knowledge or lack of knowledge, circumstances, history, and conditions at the time of the attack.

{¶ 63} The trial judge permitted the jury to consider the testimony and the report of Dr. Delaney for the limited consideration regarding the defendant's particular characteristics, knowledge or lack of knowledge, circumstances, history, and conditions at the time of the attack. Dr. Delaney reviewed Smith's medical records from the Veterans Administration and from Mount Carmel Emergency Room. She conducted a mental status examination but did not do any other testing.[8] Dr. Delaney considered two separate occasions when Smith was assaulted—once in the military, which lead to the formal diagnosis of traumatic brain injury ("TBI"), and once prior to joining the military. In the military assault, Smith was choked and his skull was fractured. In the assault prior to the military, Smith was walking in the evening when he was stomped on and continuously punched to the point of losing consciousness. Dr. Delaney described post-traumatic stress disorder ("PTSD") as generally having three components: first, PTSD can cause a person to reexperience past trauma in the form of nightmares or flashbacks; second, PTSD can cause a person to have negative outlooks such as the world is an unsafe place for them; and, third, PTSD can cause a person to have an "increased hypervigilance, so are they very easily startled, are they watching everything around them to make sure that *they* are safe, kind of always on the lookout for some kind of danger, feeling what happened to *them* before may happen again." (Emphasis added.) (Tr. Vol. 4 at 805-06.) Dr. Delaney testified that Smith specifically was experiencing symptoms of PTSD including nightmares, flashbacks,

---

[8] Smith's sixth assignment of error claims he was denied effective assistance of counsel for his trial counsel's failure to adequately prepare Dr. Delaney for testimony. Specifically, he claims trial counsel was ineffective for failing to apprise Dr. Delaney of the existence of key case materials such as Detective Lemmon's recorded interview of Smith and the composite video from neighbors' security cameras, which Smith described as indispensable to proper expert review, or to instruct her to personally conduct testing for TBI and PTSD to reconfirm Smith's psychiatric diagnosis. Smith argues that his trial counsel's ineffectiveness resulted in the jury devaluing her testimony, finding it less credible. He also argues that had she conducted testing and reviewed the recorded evidence, she would have been better able to explain how a sufferer of PTSD and TBI would be prone to react when confronted with the chaotic scene on the street in front of his house. Specifically, Smith suggests that Dr. Delaney "could have credibly explained how such a scene would trigger the enhanced fight-or-flight response, hypersensitivity to danger, and overwhelming need to act immediately characteristic to PTSD and TBI." (Smith's Brief at 66.) Dr. Delaney testified that although she was not aware that the recorded evidence existed, she would have reviewed it if she was aware and, nevertheless, she felt there was sufficient information without the recorded evidence to make a diagnosis and render an opinion. Without opining as to the sixth assignment of error, for purposes of the analysis above, I will accept Dr. Delaney's testimony as credible. Furthermore, the state filed a conditional cross-appeal asserting an assignment of error that the trial court abused its discretion in admitting Dr. Delaney's testimony and report because Smith failed to demonstrate the requirements set forth in Evid.R. 702(A). Because I conclude the trial court's omitted jury instruction that is the subject of Smith's first and second assignments of error did not result in prejudice and therefore would not reverse the judgment of the trial court, it is not necessary to address the state's assignment of error relating to Dr. Delaney's testimony and report.

heightened startle response, feelings of danger around every corner, avoidance of things that reminded him of the assaults, difficulty trusting the world, as well as physical symptoms such as heart pounding and tightness in his chest when he saw things that reminded him of the assaults. Dr. Delaney described TBI as generally having symptoms such as difficulty with judgment, impaired memory and concentration, or problems with walking or coordination if it affects the motor cortex. Dr. Delaney testified that Smith specifically was experiencing symptoms of TBI including headaches, ringing in his ears, blurry vision, as well as irritability and feeling more impulsive. Dr. Delaney further testified that PTSD and TBI together can affect the decision-making process—the PTSD causes a person to feel the world is unsafe, and a trigger can cause an increase in heart rate and breathing, and an adrenaline surge. PTSD coupled with TBI, causes a person to experience impulsivity—this creates a situation where someone experiencing both may be "primed to always react very quickly and feel like there is danger, and then having the impulsivity with the brain injury on top of it . . . can impact the way everything unfolds." (Tr. Vol. 4 at 811-12.) She opined to a reasonable degree of medical certainty that PTSD and TBI contributed to Smith's decision-making process at the time that the shooting occurred and that it "inform[ed] his ability to take the time to slowly react, to slowly, you know, observe the situation. And instead, it's going to be this very heightened, adrenaline fueled, I have got to act now because people are in danger . . . I have to make a decision at this moment, impulsivity and hyperreactivity." (Tr. Vol. 4 at 813.)

{¶ 64} Dr. Delaney opined that due to his PTSD and TBI, when Smith shot Jason, he acted impulsively because someone was in danger. However, in summarizing the general symptoms of PTSD, Dr. Delaney described PTSD symptoms in general—that a person suffering from PTSD has hypervigilance regarding their own safety. Dr. Delaney testified that for a person suffering from PTSD "the world is an unsafe place for *them*" and "are they watching everything around them to make sure that *they* are safe, kind of always on the lookout for some kind of danger, feeling that what happened to *them* before may happen again." (Emphasis added.) (Tr. Vol. 4 at 805-06.) Smith provided consistent testimony that he perceived a threat to Charae, Penn, Cordell, and Mr. Thomas, but not that he perceived a threat to himself. Furthermore, the testimony revealed he was standing on his porch or doorway when he shot Jason, and he was not in the street in the middle of the

affray.[9]   Although, initially, he did not know if his mom was in danger, his testimony revealed that he learned that she was not involved; and he had already protected his siblings by telling them to go to the basement.

{¶ 65} Accordingly, I would find the error of the omitted jury instruction did not affect Smith's substantial rights because, if the omitted instruction had been given, the entire record does not demonstrate, as to the second element of the defense of another,  a reasonable probability that the error resulted in prejudice—such that there is a probability of a different result that is sufficient to undermine confidence in the outcome of the proceeding.  Stated another way, I find that the jury could have reasonably concluded that the state proved beyond a reasonable doubt, with respect to the second element of defense of another, that "the defendant did not have reasonable grounds to believe that the people he claimed to have defended were in imminent or immediate danger of death or great bodily harm." (Tr. Vol. 5 at 1137-38.)

{¶ 66} Based on the foregoing, I concur in part and dissent in part from the majority. I would affirm the judgment of the trial court.

––––––––––

[9] Even if Dr. Delaney had reviewed the recording of Dr. Lemmon's interview and the composite video of neighbors' security cameras, presumably her testimony regarding the general symptoms of PTSD would not change; perhaps only her testimony regarding PTSD symptoms that Smith was specifically experiencing at the time of the shooting.